# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

MICHAEL T. MEGGISON,

Plaintiff,

-vs-

PAYCHEX, INCORPORATED,

Defendant.

DECISION & ORDER

08-CV-6017-CJS-MWP

## APPEARANCES

For Plaintiff:        Christina A. Agola, Esq.
                      2100 First Federal Plaza
                      28 East Main Street
                      Rochester , NY 14614
                      (585) 262-3320

For Defendant:        Todd R. Shinaman, Esq.
                      Nixon Peabody LLP
                      1100 Clinton Square
                      Rochester , NY 14603
                      (585) 263-1000

## INTRODUCTION

**Siragusa, J.** In this employment discrimination case, Plaintiff Michael T. Meggison ("Meggison") alleges violations of the Family and Medical Leave Act ("FMLA"), including retaliation. The case is now before the Court on a motion for summary judgment filed by Defendant Paychex, Incorporated ("Paychex") (Docket No. 14). For the reasons stated below, the motion is granted.

## FACTUAL BACKGROUND

The following account is, except where indicated, undisputed. Paychex hired Meggison in the summer of 2003 to work as a Distribution Specialist in the Distribution

Department at Paychex' facility in East Rochester, New York. In 2004, Plaintiff began working as an administrative assistant in Paychex's Online Services Department. Meggison's duties involved the performance of various clerical tasks, including faxing and scanning documents. During the time period relevant to this action, Meggison reported to John McDonough ("McDonough"). Upon being hired at Paychex, Plaintiff received and reviewed the Paychex Employee Handbook, which contained terms and conditions of his employment, including Defendant's FMLA leave policy. From time to time, Paychex issued Meggison updates to the Employee Handbook.

In June 2006, McDonough counseled Plaintiff for forcibly opening a break room door and throwing papers down on a desk in front of other coworkers, though Meggison testified at his deposition that he did not recall the incident or the counseling. Plaintiff's annual performance review at the end of June 2006 noted issues regarding his relationships with co-workers, but otherwise graded him four out of a possible five.

On August 7, 2006, McDonough issued Plaintiff a written warning for additional inappropriate behavior involving his co-worker relationships that occurred in June 2006. McDonough Aff. ¶ 4; McDonough Aff. Ex. B (Warning dated Aug. 7, 2006). Plaintiff contends that "the individual who claimed Plaintiff acted in an "unprofessional manner" is the one who initiated the verbal attack on Plaintiff and threw papers around in the fax room." (Meggison Aff. ¶ 19.) Meggison, however, conceded at his deposition that he signed the written warning acknowledging that he engaged in inappropriate behavior, and also acknowledging that he received Paychex' Standards of Conduct and Non-Harassment Policies. (Meggison Dep. 61).

Subsequently, on October 6, 2006, Meggison was counseled for inappropriate interactions with co-workers, including failure to acknowledge them, uncomfortable staring,

and other rude behavior. In an October 24, 2006, meeting, McDonough offered Meggison various resources, including the Paychex Employee Assistance Program and a leave of absence. Plaintiff did not follow up with McDonough regarding these offers. Plaintiff acknowledges the disciplinary record, but states

> [w]ith regards to "not acknowledging other co-workers" Plaintiff was simply attempting to act in a professional manner towards a particular co-worker. (56.1 Counter ¶¶ 50-51). With regards to allegations that Plaintiff "glared" at coworkers, Plaintiff simply removed his glasses and squinted, this was directed at no person in particular. (56.1 Counter ¶ 52). To avoid future conflict and keep peace Plaintiff apologized to his co-workers. (56.1 Counter ¶ 53).

(Pl.'s Response to Def.'s Statement of Facts ¶ 9.) However, Meggison admits that none of the 2006 disciplinary actions were in retaliation for any FMLA-protected activity.

On April 26, 2007, Meggison became ill and took time off from work after developing tumors. On May 9,2007, Paychex Leave of Absence Specialist Teresa Wesley ("Wesley") wrote to Meggison regarding leave and benefits related to his absence. The letter and enclosures included information explaining to Meggison that he qualified for FMLA leave.[1] Wesley also provided him the Paychex FMLA Policy and Procedure, which contains information on FMLA leave, including intermittent leave, and also provides employees with instructions on how to apply for FMLA. Intermittent FMLA leave is also discussed in the Employee Handbook. (Shinaman Aff. Ex. B, Employee Handbook 14.)

On May 7, 2007, McDonough filled out and approved a Request for Leave of Absence Form for Meggison. Meggison was granted leave—including FMLA leave—from April 25, 2007 to May 14, 2007. Meggison's treating physician cleared him to return to work on May

---

[1]Paychex's FMLA leave policy also required that if he was disabled and normally scheduled for 20 hours pe week, he needed to call The Hartford to report a claim for disability benefits. In addition, he was required to use seven days of sick time for the seven-day waiting period, and if no sick time was available, he was to use floating holiday time and accrued vacation. (Shinaman Aff. Ex. I, Request for Leave of Absence.)

10, 2007, and Meggison in fact returned to work on May 14, 2007. Meggison contends that he was not ready to return to work, however, but begged his doctor to return him to work so to protect his employment with Paychex. (Pl.'s Response to Def.'s Statement of Facts ¶ 14.)

On May 24, 2007, Wesley assisted Meggison with his request to supplement his disability benefits earned while on leave with paid vacation time. Plaintiff responded to an e-mail from Wesley expressing his gratitude for her assistance with issues related to his leave of absence.

On June 27, 2007, McDonough counseled Meggison for speaking loudly and making negative comments about a co-worker whom Meggison was accused of having antagonized him. McDonough warned Meggison that if his inappropriate behavior continued, further disciplinary action, up to an including termination, could occur. McDonough once again reviewed with Meggison resources available to him, including EAP and a leave of absence. Meggison did not take advantage of any of these resources.

On September 7, 2007, one of Meggison's colleagues reported to Paychex managers that Meggison, upset with another employee, stated that he wished her house would burn down and that "she would be burned up in the fire." (McDonough Aff. ¶ 12; McDonough Aff. Ex. G (Michelle L. Kimball email to Janet S. Justice dtd Sep. 7, 2007 10:17 AM).) One of Meggison's superiors also reported that Meggison had separately made similar comments to her regarding the co-worker, including that he "hated her," "he wished her house would burn down with her in it," and "he hoped any pregnancies she had would end in miscarriage." (*Id*.) Plaintiff denies having made any such statements "even remotely similar to the reports contained above." (Pl.'s Response to Def.'s Statement of Facts ¶ 18.)

Meggison was terminated on September 7, 2007, for violation of the Paychex Standards of Conduct Policy based on this incident and his prior inappropriate behavior. (McDonough Aff. ¶ 12; McDonough Aff. Exs. S, G & H.) Paychex' policy provides for discipline, up to and including discharge, where an employee's behavior "interferes with the orderly and efficient operation of a department" by, among other things, "unprofessional behavior" and "disrespect toward fellow employees." (*Id.*) Meggison responds that the termination letter stated only that he was fired for "Violation of Company Policy." (Pl.'s Response to Def.'s Statement of Facts ¶ 19.) Paychex contends that Meggison's termination was not related to his absence record or any FMLA issue, and Meggison responds that his "termination was directly related to his previous FMLA leave from April – May 2007, and then his intermittent leave between May 2007 and September 2007, including leave the day prior to his termination. (Pl.'s Response to Def.'s Statement of Facts ¶ 20.) It is undisputed that from the time Meggison returned to work on May 14, 2007, until his termination on September 7, 2007, he periodically took time off totaling fourteen hours.

## STANDARDS OF LAW

### *Summary Judgment Standard*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining

summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon

a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); Knight v. United States Fire Ins. Co., 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well–settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Family Medical Leave Act

The FMLA entitles an eligible employee to a total of twelve work weeks of leave during any twelve month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C) (2008). The Act requires that the employee give at least 30 days'

notice to the employer where the leave is foreseeable, or if not foreseeable, then "as soon as practicable." 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.303(a). The leave may be unpaid under the following circumstances:

(c) Unpaid leave permitted. Except as provided in subsection (d), leave granted under subsection (a) may consist of unpaid leave. Where an employee is otherwise exempt under regulations issued by the Secretary pursuant to section 13(a)(1) of the Fair Labor Standards Act of 1938 (29 U.S.C. 213(a)(1)), the compliance of an employer with this title [29 U.S.C. §§ 2611 *et seq*.] by providing unpaid leave shall not affect the exempt status of the employee under such section.

(d) Relationship to paid leave.

 (1) Unpaid leave. If an employer provides paid leave for fewer than 12 workweeks (or 26 workweeks in the case of leave provided under subsection (a)(3)), the additional weeks of leave necessary to attain the 12 workweeks (or 26 workweeks, as appropriate) of leave required under this title [29 U.S.C. §§ 2611 *et seq*.] may be provided without compensation.

 (2) Substitution of paid leave.

  (A) In general. An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under subparagraph (A), (B), (C), or (E) of subsection (a)(1) for any part of the 12-week period of such leave under such subsection.

  (B) Serious health condition. An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided under subparagraph (C) or (D) of subsection (a)(1) for any part of the 12-week period of such leave under such subsection, except that nothing in this title [29 U.S.C. §§ 2611 *et seq*.] shall require an employer to provide paid sick leave or paid medical leave in any situation in which such employer would not normally provide any such paid leave. An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, family leave, or medical or sick leave of the employee for leave provided under subsection (a)(3) for any part of the 26-week period of such leave under such subsection, except that nothing in this title requires an employer to provide paid sick leave or paid medical leave in any situation in which the employer would not normally provide any such paid leave.

29 U.S.C. § 2612(c) & (d); *see also Fulham v. HSBC Bank USA*, No. 99 Civ. 11054 (JGK), 2001 U.S. Dist. LEXIS 13570 (S.D.N.Y. Sep. 6, 2001) ("The FMLA explicitly permits employers to provide FMLA leave on an unpaid basis.").

In *Potenza v. City of New York*, 365 F.3d 165 (2004), the Second Circuit addressed the issue of retaliation under the FMLA and the appropriate standard to use for summary judgment. The court wrote:

> The regulations promulgated pursuant to the FMLA explain that "'[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," 29 C.F.R. § 825.220(b), and that "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c).

*Potenza*, 365 F.3d at 167. Though the Second Circuit did not resolve the issue of whether to apply the familiar *McDonnell Douglas* shifting burden analysis to all FMLA cases, it did determine that they should be applied to FMLA retaliation claims. *Id*.; *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161 (2d Cir. 2006).

### McDonnell Douglas Standard

Under the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence, (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). To establish that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, a plaintiff may demonstrate that "similarly situated" employees who do not share the plaintiff's protected characteristics were treated preferentially. *Id*.

Requirements for establishing a prima facie case are minimal. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998). If a plaintiff is successful in demonstrating his *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action. *Id*. at 153 (citing *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 802 (1973)). The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin v. Ford Model, Inc.*, 149 F.3d at 153.

Once the employer satisfies its burden, a plaintiff may prevail only if he presents evidence that the employer's proffered reasons are a pretext for discrimination. *Id*. A plaintiff, to demonstrate pretext, must show both that the proffered reason was false and that discrimination was the real reason. *Id*. In applying the *McDonnel Douglas* criteria to a case under the Age Discrimination in Employment Act, the Supreme Court has held that a plaintiff's *prima facie* case, combined with sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000). Justice O'Connor, writing for a unanimous Court, said, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*.; *see also Regional Economic Community Action Program, Inc. v. United States*, 294 F.3d 35, 49 (2d Cir. 2002).

**ANALYSIS**

Meggison contends that Paychex violated the FMLA in two distinct manners: (1) by failing to provide him with sufficient notice of his ability to take FMLA-qualifying leave, and (2) by retaliating against him for having taken FMLA leave.

### *Notice of FMLA leave rights*

There is no dispute that Paychex provided Meggison with an employee handbook when he began employment, which spelled out in detail the company's FMLA leave policies. (Paychex Employee Handbook 13 (attached as Ex. B to Shinaman Aff.).) Further, when Meggison was in the hospital in April and May 2007, Wesley, by a letter dated May 9, 2007, and sent to Meggison by certified mail, provided him with comprehensive information concerning his FMLA rights. (Wesley Aff. ¶ 2; Wesley Aff. Ex. A at 4 ("Our records indicate you qualify for FMLA.... Please review the enclosed Family and Medical Leave Policy and Procedure for further information regarding this leave.") The letter included a two-page explanation of FMLA leave. (*Id*.)  Included in the explanatory material was the following:

> If family/medical leave is requested, available sick time (up to five days annually) and unused Paid Time Off (PTO) or medical leave of absence benefits (where applicable) must be used as part of the leave. The substitution of this paid leave time for unpaid leave time does not extend the 12-week leave period and such leave will be counted towards the 12-week leave period.

(Wesley Aff., Ex. A, at PXM0000138.) At the time, the applicable federal regulation required that Paychex provide notice "no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave." 29 C.F.R. § 825.301(c) (2007). Meggison provided notice of his requirement for FMLA leave in a form dated May 8, 2007.

(Shinaman Aff. Ex. I.) Paychex' response, through Wesley's letter of May 9, 2007, timely provided the required information.

Meggison, relying on *Tambash v. St. Bonaventure Univ.*, No. 99-CV-967, 2004 U.S. Dist. LEXIS 19914, 36 (W.D.N.Y. Sept. 24, 2004), a Report and Recommendation by U.S. Magistrate Judge Hugh B. Scott, argues that, although Paychex was aware of Meggison's need for additional FMLA leave, it prevented him from obtaining such leave by terminating him before he could make an appropriate request. (Pl.'s Mem. of Law at 5–6.) Meggison contends he tried to question "several different employees" concerning what he needed to do to obtain FMLA leave, but "was never given complete answers by any of the employees he approached, by reviewing the Paychex hand book, or by calling the designated telephone services, and was repeatedly referred to other telephone numbers and people." (*Id*. at 6.) In that regard, Meggison testified:

> I remember asking lots of people about different things, and I was never given a complete answer, ever. I went to CSMs. I went to Maria, who I trusted quite a bit there. I went to—I don't think I went to Iris. I went to Beth, maybe, I don't remember anything more than I got conflictory answers. I was always confused about what to do or how to go about it.

(Meggison Dep. 72:21–73:4.) However, at his deposition, Meggison admitted he never asked his own supervisor, the man who was encouraging him to take time off. (Meggison Dep. 72:14–18.) Nevertheless, Meggison "just took time off for [his]—whenever [he] had to go to a doctor's appointment. What if fell under, whether if fell under should [he] take it as this or take it as that, [he] was never given a complete answer." (*Id*. at 75:5–9.) Meggison further testified that "he was making significantly less with all The Hartford[2] garbage that was going

---

[2]Probably a reference to Paychex' disability insurer.

on. I felt that if I didn't get back to work, there would be much more problems to contend with." (*Id*. at 79:19–22.)

"At the summary judgment stage, Plaintiff must show, *inter alia*, that []he gave [his] employer sufficient notice of [his] need for FMLA leave." *Beligotti-Fenti v. Paychex, Inc.*, No. 08-CV-6019, 2009 U.S. Dist. LEXIS 103678, 15-16 (W.D.N.Y. Nov. 5, 2009). No evidentiary proof in admissible form is before the Court to show that Meggison gave notice to Paychex that the additional leave time he took for the purposes of caring for a qualifying illness. "Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(b) (2008) (73 F.R. 67934, 68073, Nov. 17, 2008). The proof before the Court on this motion shows that Plaintiff took of a total of fourteen hours between his return from FMLA leave and his termination, but that he never asked for FMLA leave, despite having just returned from using that leave, and Paychex was not put on notice of a need for FMLA leave:

> Q. After the time you were diagnosed with your medical condition while you were working at Paychex, did you ever have occasion to become sick thereafter?
>
> A. Sick with the medical condition itself?
>
> Q. Yes.
>
> A. Yes, several times.
>
> Q. Would that have been the case during your employment at Paychex?
>
> A. Absolutely.
>
> Q. What were some of the symptoms, if you can recall?
>
> A. Related to the medications that I had to—all of a sudden had to take that I wasn't used to, that were very strong because they're made to shrink tumors, so I was having all sorts of weird effects. My head was aching. Sometimes I had problems driving. I had problems sleeping.
>
> Q. Do you believe those symptoms were apparent?

-13-

A. Very apparent.

Q. Was Paychex aware of those symptoms?

A. I don't think I told Paychex about them because, like I said, I had a strained relationship with them at that point.

Q. You did ask for time off, though; correct?

A. Yes, I did ask for time off, though.

(Meggison Dep. 189:5–190:8.) Paychex has shown that Meggison will be unable to prove a necessary element with respect to his notice claim.

### *Retaliation for using FMLA leave*

Meggison contends that he was wrongfully terminated from employment as a result of Paychex' retaliation for his having used FMLA leave. He argues that the temporal proximity, "[p]articularly where, as here, the timing between the protected activity and the adverse action is extremely close," alone can be sufficient to generate a material issue precluding summary judgment and can be enough to meet his obligation to show a *prima facie* case. (Pl.'s Mem. of Law 12.) Meggison maintains in his memorandum of law that the day prior to his termination, he used a floating holiday to visit a doctor in Binghamton, New York, approximately a three-hour drive from Rochester. (Pl.'s Mem. of Law 13.) However, in his affidavit (¶ 68), he says, "[t]he day prior to my termination, I was out on floating holiday time to go to a doctor's visit at Rochester-Genesee Hospital." Then, in his deposition testimony, Plaintiff stated, "[t]he day before [his termination], I took a day off; I was sick. I think I had to go to Bingham." (Meggison Dep. 120:22–24.) Regardless of whether he stayed in

Rochester, went to Binghamton, or visited Dr. Bingham,[3] it appears he took a floating holiday[4] on September 6, 2007. In his affidavit he describes what happened the following day:

> [O]n Friday, September 7, 2007, McDonough called the [sic] me into an office with what appeared to me to be two police officers. Upon seeing the officers, and due to the shock of the entire situation, I became full of anxiety and left the building. I was not allowed to enter the building again, even to get my personal belongings, including my glasses,[5] and was told by the officer in the parking lot "Don't ever come on these grounds again." A follow up termination letter was sent to me, dated September 10, 2007, describing how I had left the meeting and that I was removed from payroll due to "Violation of Company Policy."

(Meggison Aff. ¶¶ 70–73.) Meggison points out in his affidavit that the termination letter was not specific as to which policy he had violated, thus, "[d]ue to the lack of specific policy violations, and in light of previous positive performance evaluations, I concluded that my termination must have been caused by my illness." (*Id*. ¶ 76; *see also* Meggison Dep. 129:10–11 ("I believe that I was being discriminated against since I got the tumor.")

However, nothing in the proof before the Court shows that Paychex was aware that Meggison took off time on September 6 for an FMLA-qualified purpose. Therefore, his argument that the termination on September 7 was a result of his time off on September 6 is unpersuasive. Further, the elapsed time between his return from FMLA leave on May 14, 2007, and his termination on September 7, 2007, three months and twenty-four days, is insufficiently temporally proximate to infer that his termination was a result of his having taken FMLA qualifying leave. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.

---

[3]Dr. Robert Bingham is mentioned in Meggison's deposition testimony as having treated him for his tumors. (Meggison Dep. 160:8, 120:24, 121:10, 145:24, 146:11 & 187:21.)

[4]At the deposition, Meggison was shown his time sheet for the day, which showed he took off three and one half hours on Thursday, September 6, 2007. (Meggison Dep. 122:7–25.)

[5]Meggison testified that he did not ask to retrieve his glasses. (Meggison Dep. 127:10–21.) He also stated that he was nearsighted and drove without his glasses. (*Id*. 126:11-16.)

1990) (period from July 10, 1984 to October 26, 1984, insufficient to show temporal proximity);

Meggison also argues that even if he is required to show more than a temporal proximity, he has done so through his testimony about the "hostile work environment that welcomed [sic] him back after his emergency hospitalization due to his brain tumors." (Pl.'s Mem. of Law 14.) In contrast, at his deposition, Meggison testified that he thought:

> Q. What is it that made you concerned about your job, about having a job if you didn't come back?
>
> A. I believed that I would be discriminated against there because of the tumor thing, because people don't understand tumors. They associate, you know, Charles Whitman shooting people from a bell tower because of tumors; he had—he was discovered to have tumors. People—I was just fearing that already people had known that I was very sick, and I was very worried that people would just mischaracterize what had happened to me. And I was afraid that I would have a very hostile work environment, because I know how I've heard co-workers laughing about people being crazy, and J was afraid that I would be less respected. They were making fun of a kid named Adam, calling him crazy. And…
>
> Q. Did anyone say anything to you that led you to believe that you would be treated differently or your job would be in jeopardy related to your time off related to the tumor?
>
> MR. LTTTLE: Form.
>
> A. I don't recall. J just recall that people were very hesitant talking to me, and I felt In the air that something was just different when I got back.

(Meggison Dep. 80:14–81:18.) As his testimony makes clear, though, Meggison felt employees were hostile toward him not because he took time off under the FMLA, but, rather, because fellow employees associated him with Charles Whitman[6] as a result of Meggison's

---

[6]"Charles Joseph Whitman (June 24, 1941–August 1, 1966), a student at the University of Texas at Austin, killed 14 people and wounded 32 others during a shooting rampage on and around the university's campus…. A glioblastoma, which is a highly cancerous brain tumor, was discovered during autopsy that experts on the 'Connally Commission' claimed may have conceivably played a role in causing his actions." Wikipedia, Charles Whitman, *available at* http://en.wikipedia.org/wiki/Charles_Whitman (last visited Dec. 9, 2009).

*tumors.* Viewing the evidence in the light most favorable to Meggison, the non-moving party, the Court determines that Meggison has failed to come forward with evidentiary proof that Paychex terminated him as a result of his having taken FMLA-qualifying leave, or because he sought additional leave time after his return from FMLA leave.

Nevertheless, even if Meggison had met his burden of proving a *prima facie* case of retaliation, Paychex has come forward with a legitimate, non-discriminatory reason for Meggison's termination, and Meggison's proof does not raise a material issue of fact to refute that reason.

Before Meggison took FMLA leave, Paychex had already disciplined and counseled him for inappropriate behavior in the workplace. As described in McDonough's affidavit, Meggison was disciplined in June 2006 "for forcibly opening a break room door and throwing papers down on a desk in front of other co-workers." (McDonough Aff. ¶ 3.) On August 7, 2006, McDonough issued a written warning to Meggison in which he stated,

> In June 2006, we spoke about my concerns with unprofessional behavior you had demonstrated in the workplace. After this conversation, you agreed you would behave professionally.
>
> Since this time, I have learned of additional instances where you did not behave professionally in the workplace and you caused a coworker to feel uncomfortable. This behavior occurred when you approached two coworkers on separate occasions and made comments/asked questions about another coworker. This type of behavior is disruptive in the workplace and it is imperative it stop Immediately.

(McDonough Aff. Ex. B.) Meggison signed the notice on August 8, 2006. (*Id*.) On October 6, 2006, McDonough counseled Meggison for unprofessional interactions with fellow employees, including failure to acknowledge them, uncomfortable staring and other "rude behavior." (McDonough Aff. ¶ 5.) In a follow-up email, McDonough wrote, "your technical

performance has been very good but your interpersonal skills and relationships with co-workers had not been at an acceptable level." (McDonough Aff. Ex. C.) On April 25, 2007, Meggison was admitted to the hospital after discovery of his brain tumors. McDonough filled out and then approved Meggison's FMLA leave, and Meggison returned on May 14, 2007. On June 27, 2007, McDonough counseled Meggison "for speaking loudly and making inappropriate comments about a co-worker on June 18 and 19, 2007." (McDonough Aff. ¶ 11.) McDonough issued a memorandum dated July 9, 2007, memorializing the counseling and Meggison's signature appears there, dated July 9, 2007. In addition to counseling Meggison, McDonough provided a list of resources available to him, including "vacation/float time, EAP and/or a leave of absence." (McDonough Aff. Ex. F.) On September 7, 2007, Michelle L. Kimball informed McDonough that Meggison, on September 5, 2007, stated that he "wished another co-worker's house would burn down and that 'she would be burned up in the fire.'" (McDonough Aff. ¶ 12; McDonough Aff. Ex. G.) Janet Justice reported to McDonough on September 7, 2007, that Meggison, in a conversation with her in her office, made similar comments about the same co-worker, "including that he 'hated her,' 'he wished her house would burn down with her in it,' and 'he hoped any pregnancies she had would end in miscarriage.'" (*Id*.)

Meggison argues in his Memorandum of Law that Paychex' "reasons appear on their fact [sic] to be valid reasons for terminating any person in the workplace…." (Pl.'s Mem. of Law 16.) Nonetheless, Meggison contends that his "termination did not coincide nearly as temporally with the myriad of complaints touted so vociferously by [Paychex] as it did to the exercise of his FMLA rights." (*Id*.) The Court disagrees. As determined above, Meggison's argument that only one day separated his leave for medical purposes (a doctor's visit) and

his termination, is without merit, since the evidentiary proof fails to establish that Paychex knew his use of floating holiday time was for the purpose of a doctor's visit. Therefore, the nearest temporal proximity is between his return from FMLA leave on May 17, 2007, and his termination on September 7, 2007, a period of 113 days, or three months and twenty-one days, which, as indicated above, case law has held is, in itself, an insufficient temporal proximity to infer discriminatory intent. Moreover, as the Court has previously observed, temporal proximity alone is insufficient to carry a plaintiff's burden of proof beyond the *prima facie* stage. *Richter v. Monroe County Dep't of Soc. Serv.*, No. 01-CV-6409 CJS, 2005 U.S. Dist. LEXIS 5800, *23 (W.D.N.Y. Feb. 11, 2005). Nothing presented here on this motion suggests that Paychex terminated Meggison as a result of his FMLA leave, or because he required additional leave that could have qualified under the FMLA.

## CONCLUSION

For the reasons stated above, Paychex motion (Document No. 14) for summary judgment is granted. The Clerk is directed to enter judgment for Paychex and close this case.

IT IS SO ORDERED.

Dated: January 8, 2010
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge